# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

—————————————

Nº 16-CV-3538 (JFB)

—————————————

CHARLES CARLSEN,

Plaintiff,

VERSUS

NANCY A. BERRYHILL[1],
ACTING COMMISSIONER OF SOCIAL SECURITY

Defendant.

—————————————

**MEMORANDUM AND ORDER**
September 19, 2017

—————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Charles Carlsen ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA") challenging the final decision of the acting Commissioner of Social Security (the "Commissioner") denying plaintiff's application for retroactive disability insurance benefits for the time between June 24, 2008 and March 6, 2013. Following an April 2011 hearing before an Administrative Law Judge ("ALJ") and an adverse decision by the ALJ, plaintiff first appealed to this Court on March 5, 2013, and on September 11, 2014, the case was remanded by the Honorable Joanna Seybert, United States District Judge. *See Carlsen v. Colvin* ("*Carlsen I*"), No. 13-CV-1164 JS, 2014 WL 4536728 (E.D.N.Y. Sept. 11, 2014). The Court found that the ALJ (1) failed to assign any weight to the medical opinion of plaintiff's treating physician, Dr. Carlson, and (2) failed to "consider[] the effects of Plaintiff's obesity, if any, in conjunction with Plaintiff's ankle impairment at the various steps of the evaluation process." *Id*. at *7-10.

---

[1] Plaintiff commenced this action against Carolyn W. Colvin, who was then the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to substitute Nancy A. Berryhill, who now occupies that position, as defendant in this action.

Upon remand, the ALJ determined, following a June 2015 hearing, that plaintiff was not disabled during the relevant period after finding that plaintiff had the residual functional capacity to perform the full range of light work, for which there were a significant number of jobs in the national economy. The Appeals Court denied plaintiff's request for review, and plaintiff commenced the instant action.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes plaintiff's motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. BACKGROUND

### A. Factual Background

The following summary of the relevant facts is based on the Administrative Record ("AR") developed by the ALJ. (ECF No. 10.)

#### 1. Personal and Work History

Plaintiff worked as a tractor-trailer driver from 1981 to April 20, 2008. (AR at 155.) In that job, he used skills and technical knowledge. (*Id*. at 156.) He spent 8 hours per day handling large objects, but lifted less than 10 pounds. (*Id*.)

At the April 2011 ALJ hearing, plaintiff testified that he had been a truck driver for 15 years preceding 2008. (*Id*. at 66.) However, he said that he had left his job on or around April 15, 2008, because his employer's warehouse had closed. (*Id*. at 51.) He obtained unemployment benefits and testified that he could not find a new job because his ankle precluded him from meeting the physical requirements. (*Id*. at 51-52.)

#### 2. Plaintiff's Claimed Injuries and Activities

At the April 2011 ALJ hearing, plaintiff testified that he felt constant pain in his left ankle arising from a broken ankle; following three surgeries, he now had a plate. (*Id*. at 55-56.) He testified to pain in his left shoulder due to a dislocation before 2008, after which accident, despite the shoulder pain, he had continued to work. (*Id*. at 56-57.) He agreed that his shoulder was "not much" of a bother. (*Id*. at 57.) Later, he also stated that he has pain in his knee when he walks too much. (*Id*. at 59.) He also testified that he had pain in his hands when it was damp due to arthritis; he stated that they would swell and he was unable to handle and grasp well. (*Id*. at 60.) He further stated that he has difficulty sitting due to soreness supposedly arising from blood in his spinal fluid. (*Id*. at 64.)

At the April 2011 ALJ hearing, plaintiff also testified that he took Vicodin four times daily for pain in his left ankle (*id*. at 65), which helped him "function" and "took the edge off" (*id*. at 74). He had stomach problems as a side effect of the Vicodin. (*Id*. at 65.) The pain, which was located in his left leg, was 6/10 in terms of intensity. (*Id*. at 74.) He wore no back or knee brace, only a left foot/ankle brace. (*Id*. at 59, 65, 73.) He stated that he had been prescribed a cane. (*Id*. at 55.) He had not undergone surgery on his neck, shoulders, back, or hands. (*Id*. at 84.)

Plaintiff further testified that he was unable to stand for "any length of time" (*id*. at 54, 76), which he clarified meant more than 10 or 15 minutes (*id*. at 54). He testified to being unable to walk for "any length of time," which meant more than 20 to 40 minutes. (*Id*.

at 54-55.) He could sit for about a half-hour before he had to move. (*Id*. at 64.) He admitted that he could carry up to 30 pounds, and when his arthritis was acting up, he could carry up to 10 pounds. (*Id*. at 62-63.) He testified that he had no difficulty reaching. (*Id*. at 62.) He testified that he was able to open doors, hold cups of coffee, eat with a fork and knife, and open drawers. (*Id*. at 71.) He could squeeze toothpaste and use an electronic can opener. (*Id*. at 64.)

At the April 11 hearing, plaintiff also testified that he could shower, comb his hair, shave, and dress, including doing his belt, zippers, and coat buttons. (*Id*. at 68.) When his hands are swollen, he tries to avoid buttons. (*Id*. at 62.) He had trouble with socks because of his ankle. (*Id*. at 76.) He was able to do laundry, with assistance (*Id*. at 69.) He was able to take out the garbage. (*Id*. at 70.) Plaintiff was able to lift 30 pounds of groceries. (*Id*. at 62.) He admitted to being able to drive locally, such as to the store or to a friend's house. (*Id*. at 72.) He admitted that he could go to: a restaurant (*id*. at 72); the movies (*id*. at 71); the barber (*id*. at 68); an ATM (*id*. at 70); a bank (*id*. at 71); and the post office. (*Id*. at 70.) He did not know how to use a computer. (*Id*. at 72.)

Plaintiff did not testify to other subjective complaints or limitations at the June 9, 2015 ALJ hearing or otherwise supplement the above testimony. (*See generally id*. at 329-53.)

### 3. Testimony of the Vocational Expert

Vocational Expert ("VE") Espironza Destefano testified at the June 2015 ALJ hearing that plaintiff's past relevant work could best be described as tractor-trailer driver, U.S. Department of Labor's *Dictionary of Case Occupational Titles* ("DOT") code 904.383-010, with a specific vocational preparation ("SVP") of 4. (*Id*. at 344-45.) The VE testified that this job required the residual functional capacity ("RFC") to perform medium work, even in the manner plaintiff had testified to performing it (such as lifting no more than 10 pounds), because there could have been times when he had been required to readjust the load or check air pressure. (*Id*. at 345.)

The ALJ then asked the VE if there were any jobs a hypothetical individual could perform who had the same age, educational background, and work history as plaintiff, with the proviso that plaintiff be restricted to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking 6 hours out of an 8-hour day; sitting 7 hours out of an 8-hour day with normal breaks; frequently pushing/pulling with the upper extremities; frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching; occasionally pushing and pulling with lower extremities; occasionally crawling and overhead reaching with the left upper extremity; and no climbing ladders/scaffolds or exposure to unprotected heights and moving machinery. (*Id*. at 345-46.) The VE testified that, during the relevant period, plaintiff could have performed six jobs, all requiring the RFC for light work. (*Id*. at 345-50.) Three of them were for SVP of 2, *i.e.*, unskilled work: (1) electrical equipment assembler, DOT code 729.687-010 (5,208 jobs in the national economy); (2) mail clerk, DOT code 209.687-026 (2,481 jobs in the national economy); and (3) office helper, DOT code 239.567-010 (3,588 jobs in the national economy). (*See id*. at 348-49.)

An additional three such jobs had an SVP of 3 or 4, based on transferable skills that the VE testified that plaintiff had earned in his past relevant work: knowledge of how to load items, ability to check the load and manage his own time, critical thinking skills to identify problems, understanding of written information, and communication skills

necessary in talking to others to convey information effectively. (*Id*. at 347-48). These three additional jobs that plaintiff could have performed during the relevant period were: (1) loading inspector, DOT code 910.667-018 (504 jobs in the national economy); (2) perishable freight inspector, *DOT* code 910.667.022 (457 jobs in the national economy); and (3) shipping clerk, *DOT* code 219.367-030 (20,911 jobs in the national economy). (*Id*. at 346-48.) In response to plaintiff's counsel's inquiry as to whether the ability to communicate and use logic and reasoning were skills plaintiff would have acquired from his past work experience, the VE responded in the affirmative. (*Id*. at 349-52.)

4.  Medical History

    a.  From June 24, 2008 to March 6, 2013

On July 7, 2008, plaintiff saw orthopedist Michael J. Fracchia, M.D., at Long Island Bone and Joint, for left ankle pain. (*Id*. at 184-85.) Plaintiff reported pain since June 24, 2008, when he twisted his ankle getting out of a truck. (*Id*. at 184.) Plaintiff reported that he had fractured his left ankle in 1984, undergoing three surgeries, most recently a fusion in 1991, since which he had experienced almost no pain. (*Id*.) The only other medical history reported was hypertension for which plaintiff was taking an anti-hypertensive, the name of which he could not recall. (*Id*.) On examination, Dr. Fracchia found that plaintiff was 5 feet 8 inches and 280 pounds. (*Id*.) He had diffuse swelling of the left ankle, but no bruises, erythema, warmth, or discharge, and no eversion or inversion. (*Id*.) The range of motion in plaintiff's ankle was limited, and it was tender to palpation. (*Id*. at 184-85.) There was decreased sensation on the top of his foot and the front of his ankle, which plaintiff stated was unchanged from years

earlier. (*Id*. at 185.) X-rays of the left ankle reportedly revealed four intact screws from his prior surgeries. (*Id*. at 185.) Dr. Fracchia noted an old non-union fracture, but no acute fractures or dislocations; the ankle joint was completely fused. (*Id*.) Dr. Fracchia diagnosed left ankle osteoarthritis, status post fusion. (*Id*.) Dr. Fracchia recommended conservative treatment such as ice, elevation, and anti-inflammatory medication as needed. (*Id*.) Dr. Fracchia advised plaintiff to bear weight as tolerated. (*Id*.)

On August 14, 2008, plaintiff returned to Dr. Fracchia. (*Id*. at 183.) Plaintiff reported some improvement in pain level. (*Id*.) He reported taking Naproxen for about one week, but he had not purchased the rocker bottom shoe that had been prescribed. (*Id*.) Physical examination results were essentially unchanged, with limited range of motion; there were no signs of erythema, warmth, or discharge. (*Id*.) Dr. Fracchia noted that plaintiff declined to purchase the orthopedic shoe and would return on an as-needed basis. (*Id*.)

On June 2, 2009, plaintiff saw Natalya Laskina, PA, at Middle Country Medical Care, for the purpose of a physical examination required for his Department of Transit certification to drive a truck. (*Id*. at 191, 279-80.) PA Laskina noted plaintiff's history of left-ankle reconstruction and shoulder sprain. (*Id*. at 280.) She found that plaintiff's blood pressure was 150/98.5. (*Id*.) She found that his height was 5 feet 8 inches and his weight was 257 pounds. (*Id*.) On the same day, PA Laskina completed a Medical Examination Report for Commercial Driver Fitness Determination, noting that high blood pressure was the only significant medical finding, and indicating that, medically, plaintiff was qualified to drive for one year. (*Id*. at 200-03, 281-84.) PA Laskina specifically checked off "no" on the boxes asking whether there were any: vascular

irregularity; musculoskeletal problems, such as limitation of motion and tenderness; or limb impairments, such as impairment of leg or foot, perceptible limp, atrophy, weakness, clubbing, edema, or insufficient mobility and strength or grasp, either to maintain steering or to operate pedals. (*Id*. at 202.) She also checked off "no" on the questionnaire as to: chronic low back pain; impaired hand, arm, foot, leg, finger, or toe; diabetes; and heart disease. (*Id*. at 200.)

On June 15, 2009, plaintiff went to the emergency room of John T. Mather Memorial Hospital, complaining of pain and decreased range of motion in his right shoulder. (*Id*. at 205-11.) Plaintiff reported that the symptoms began the night before and that he had not experienced similar symptoms previously. (*Id*. at 207.) On examination, plaintiff had tenderness, pain, and limited range of motion in his right shoulder; there was normal circulation, pulse, and perfusion. (*Id*.) All other joints were normal, and physical examination was otherwise unremarkable (*Id*.) The examiner ordered an x-ray of plaintiff's right shoulder, which was negative. (*Id*. at 210.) The examiner diagnosed a rotator cuff sprain and tendonitis, splinted the shoulder, and prescribed Toradol and Naprosyn. (*Id*. at 208.)

On February 5, 2010, plaintiff saw James E. Carlson, D.O., a primary care physician, for an upper respiratory infection, blood pressure check, and left ankle pain. (*Id*. at 217; *see id*. at 265.) On physical examination, plaintiff's heart rate was normal and rhythm was regular, there was no compartment syndrome musculoskeletally, deep tendon reflexes in knees and ankles were equal bilaterally, and sensory examination was intact to light touch distally. (*Id*.) Dr. Carlson advised plaintiff to continue with his current blood pressure medication. (*Id*.)

Plaintiff returned to Dr. Carlson on March 11, 2010. (*Id*. at 216.) Based on the results of a recent blood test, Dr. Carlson noted that plaintiff had non-insulin dependent diabetes. (*Id*. at 216, 218-22.) Plaintiff's blood pressure at the time was 128/80. (*Id*. at 216.) A physical examination was otherwise unremarkable, and Dr. Carlson advised plaintiff to reduce his intake of carbohydrates. (*Id*.)

On March 16, 2010, plaintiff saw Svetlana Ilizarov, M.D., an orthopedist affiliated with Stony Brook Hospital, for his ankle pain. (*Id*. at 494.) Dr. Ilizarov ordered x-rays of plaintiff's left ankle, which revealed that plaintiff was status-post ankle surgery, with a non-united middle third fibular shaft fracture. (*Id*. at 224.) Dr. Illizarov advised plaintiff to use heel lifts, and referred him to Steven P. Sampson, M.D., to evaluate him for possible surgery. (*Id*. at 494.)

On April 1, 2010, plaintiff returned to Dr. Carlson to discuss his ankle and his blood pressure medication. (*Id*. at 215, 274.) Plaintiff stated that his current pain medication was not helping. (*Id*.) Neurologic examination showed no focal findings, musculoskeletal examination showed no compartment syndrome, and cardiovascular examination showed normal rate and regular rhythm. (*Id*.) Blood pressure was 132/68. (*Id*.) Dr. Carlson prescribed Vicodin in addition to refilling blood pressure medication. (*Id*.)

On April 5, 2010, plaintiff saw Dr. Sampson for his ankle pain, which had worsened over the prior three months. (*Id*. at 225.) Dr. Sampson noted that plaintiff was status/post tibiotaler fusion 25 years previously. (*Id*.) On examination, Dr. Sampson found that plaintiff was overweight, walked with an antalgic gait, and had ankle joint tenderness. (*Id*.) There was no crepitus or instability. (*Id*.) Dr. Sampson

recommended a silicone ankle foot orthosis (ankle brace). (*Id*.) After receiving the brace, plaintiff returned to Dr. Sampson on June 8, 2010, and there were no significant findings. (*Id*. at 226.)

On June 9, 2010, plaintiff was consultatively examined by psychologist Kathleen Acer, Ph.D. (*Id*. at 227-30.) Plaintiff complained of memory and concentration difficulties, such as forgetting to do things, and difficulty falling asleep. (*Id*. at 227.) He denied symptoms of formal thought, major depressive, or anxiety-related disorder. (*Id*.) He had never been evaluated or treated for cognitive or emotional problems. (*Id*.) Plaintiff stated he has a GED and was a truck driver until he was laid off in 2008, and now could not work due to chronic left leg pain. (*Id*.) He took Lisinopril and Vicodin as needed. (*Id*.) Plaintiff reported that he was able to bathe, dress, and groom himself; cook; shop; and drive. (*Id*. at 228.) He stated that he needed help managing his finances because he would forget to pay his bills. (*Id*.) He reported limited socialization, but good relationships with family. (*Id*. at 228-29.) He stated that he spent his days driving his daughter to and from school, watching television, and running errands. (*Id*. at 229.) On mental status examination, plaintiff had a socially skilled manner, and his posture and eye contact were normal; thought processes were coherent and goal-directed; affect was full range; mood was euthymic; sensorium was clear; attention and concentration were intact and plaintiff was able to calculate and count serial 3s; his recent and remote memorial skills were intact; he could recall three of three objects and seven digits forward and five digits back after a five-minute delay; his intellectual skills were average; general fund of information was appropriate to experience; his insight and judgment were good; and his speech was fluent and clear, with adequate expressive and receptive language skills. (*Id*.

at 228.) Dr. Acer opined that plaintiff could follow and understand directions and instructions, appropriately perform tasks, maintain attention and concentration at least on a short-term basis, maintain a regular schedule, learn new tasks, perform complex tasks independently, adequately relate with others, and deal with stress. (*Id*. at 230.) She opined that her findings were not consistent with severe cognitive issues hindering functioning. (*Id*.)

On June 9, 2010, the same date, plaintiff was also consultatively examined by internist Ammaji Manyam, M.D. (*Id*. at 231-34.) Plaintiff complained of two months of throbbing left leg pain. (*Id*. at 231.) He reported a history of a 1984 motor vehicle accident that shattered his left ankle, with repeated ankle injuries and repair in 1988 and 1996, resulting in a plate in his left ankle. (*Id*.) He reported hypertension. (*Id*.) He took Vicodin four times a day and Lisinopril as needed. (*Id*.) He cooked, cleaned, did laundry, shopped, showered, bathed, dressed, and drove a car. (*Id*. at 232.) He was 260 pounds and 5 feet and 8 inches. (*Id*.) On examination, Dr. Manyam noted that, without his ankle brace, plaintiff dragged his left leg. (*Id*.) With the brace, the dragging was mildly corrected, and Dr. Manyam recommended continued use of the brace. (*Id*.) Plaintiff could walk on his heels and toes, with some difficulty. (*Id*.) He could perform a three-quarters squat, had a normal stance, and used no assistive devices such as a cane. (*Id*.) He needed no help changing for the examination or getting on and off the examination table. (*Id*.) He was able to rise from a chair without difficulty. Plaintiff's blood pressure was 136/80. (*Id*.) He had no jugular venous distension of the neck or bruits. (*Id*. at 233.) Percussion was normal and chest was clear to auscultation. (*Id*.) Cervical and lumbar spine had full flexion, extension, and rotary movement. (*Id*.) Plaintiff had full range of motion—

bilaterally—of the shoulders, elbows, forearms, wrists, knees, and ankles. (*Id.*) Hand and finger dexterity was intact and grip strength was 5/5 bilaterally. (*Id.*) All joints were stable and non-tender, and there was no redness, heat, swelling, or effusion; and there was no thickening, ankyloses, or subluxation. (*Id.*) Deep tendon reflexes were physiologic and equal in upper and lower extremities. (*Id.*) There was no sensory deficit. (*Id.*) Strength was 5/5 in upper and lower extremities. (*Id.*) There was edema of the extremities. (*Id.*) No muscle atrophy of the extremities was evident. (*Id.*) As to the left foot, there was a slight irregularity because of the hardware inside, and scarring, as well as a varus deformity. (*Id.*) Dr. Manyam diagnosed hypertension and left leg pain secondary to old injuries and to old healed fractures with intact hardware. (*Id.* at 234.) He opined that plaintiff had no limitations for physical activities. (*Id.*)

On July 14, 2010, plaintiff followed up with Dr. Carlson for diabetes and left leg pain. (*Id.* at 275.) Plaintiff was wearing his ankle brace and complaining of increased pain in his left leg. (*Id.*) A physical examination, including of plaintiff's musculoskeletal and neurological systems, was unremarkable. (*Id.*) Plaintiff was instructed to continue Lisinoprol and Vicodin, and to check his glucose with strips. (*Id.*) On August 31, 2010, plaintiff returned to Dr. Carlson complaining of severe ankle pain. (*Id.*) Plaintiff's left ankle was tender and swollen, as compared to the right; the examination was otherwise unremarkable. (*Id.* at 276.) On October 1, 2010, plaintiff followed up for low vitamin B12 and was given a B12 shot; physical examination was again unremarkable. (*Id.* at 278.)

On March 24, 2011, Dr. Carlson completed a Multiple Impairment Questionnaire. (*Id.* at 265-72.) Therein, Dr. Carlson noted that he had been treating plaintiff since February 2010 every 2-3 months. (*Id.* at 265.) He diagnosed left ankle fracture status-post reconstructive surgery with guarded prognosis, and, for "clinical findings," noted "hardware" in plaintiff's left ankle, and, for "diagnostic findings," noted "x-ray." (*Id.* at 265-66.) He stated that any motion precipitates daily pain in the left ankle at 8-9/10 on a pain scale. (*Id.* at 267.) He further asserted that plaintiff was taking Vicodin as needed and did not identify any side effects. (*Id.* at 269.) Dr. Carlson opined that plaintiff: could sit and stand/walk for no more than one hour each in an 8-hour workday (*id.* at 267); could not sit or stand continuously in a work setting, and would need to get up and move around every half hour (*id.* at 267-68); and could lift and carry up to 10 pounds on an occasional basis (*id.* at 268). Dr. Carlson opined that plaintiff: had arthritis in both hands and, therefore, would have moderate limitations in grasping, turning, twisting, fine manipulations, fingering, handling, and reaching (*id.* at 268-69); was completely unable to push, pull, kneel, bend, or stoop; and had to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights (*id.* at 271). He added that plaintiff also had limited vision. (*Id.*) Dr. Carlson further opined that plaintiff's pain, fatigue, or other symptoms would interfere with his attention and concentration on a constant basis. (*Id.* at 270.) Dr. Carlson also stated that plaintiff's impairment would interfere with his ability to keep his neck in a constant position. (*Id.* at 269.) He stated that plaintiff's symptoms and limitations had existed since March or April of 1984. (*Id.* at 271.)

On September 20, 2011, plaintiff was examined by orthopedist Leon Sultan, M.D., at the request of his attorney. (*Id.* at 294-95.) Plaintiff complained of chronic pain and swelling of his left ankle, and a limp for which he used a brace while walking. (*Id.* at 294.) Plaintiff reported an ankle fracture in

1984, and multiple surgeries in the 1980s to reconstruct his ankle. (*Id*.) He was prescribed an ankle brace in April 2010. (*Id*.) He reported being laid off in 2008. (*Id*.) Plaintiff reported taking Vicodin and Lisonopril. (*Id*. at 295.) On examination, Dr. Sultan observed that plaintiff favored his left lower extremity when he walked without his ankle brace. (*Id*.) His left leg was one-quarter inch shorter and his left calf had significant atrophy. (*Id*.) His ankle was frozen at approximately 20 degrees of plantar flexion, secondary to the ankle fusion. (*Id*.) Sensory testing of his left foot and ankle was intact. (*Id*.) Dr. Sultan opined that plaintiff had a permanent disability caused by the 1984 fracture that "interferes with" walking, prolonged standing, heavy lifting, carrying, squatting, stopping, and crawling. (*Id*.) He was unable to engage in gainful employment. (*Id*.) Dr. Sultan recommended that plaintiff lose weight. (*Id*.)

On the same date, Dr. Sultan completed a Multiple Impairment Questionnaire about plaintiff's functional abilities. (*Id*. at 285-93.) Dr. Sultan listed the primary symptoms as daily pain and swelling in the left ankle, and limping. (*Id*. at 286.) Dr. Sultan noted no side effects reported by plaintiff. (*Id*. at 289.) Dr. Sultan opined that plaintiff could lift and carry up to 10 pounds frequently, and up to 20 pounds occasionally. (*Id*. at 288.) He opined that plaintiff did not have any difficulty in reaching, handling, or lifting, grasping, turning, or twisting (*id*. at 288), nor any limitation using his fingers or hands for fine manipulation, or reaching overhead bilaterally (*id*. at 289). He opined that plaintiff was precluded from pushing, pulling, kneeling, bending, and stooping, and had to avoid heights. (*Id*. at 298.) He opined that plaintiff could sit for 2 to 3 hours per day, and must rise and move hourly, and could stand or walk for 1 to 2 hours per day. (*Id*. at 287.) Dr. Sultan assessed that plaintiff could not sit or stand continuously. (*Id*. at 287-88.) Plaintiff would be absent more than thrice a month from work. (*Id*. at 291.) Dr. Sultan opined that the earliest date that the description of symptoms and limitations applied was 1984. (*Id*.)

On January 3, 2012, plaintiff saw Antoun Mitromaras, M.D., from North Shore Immediate Medical Care, complaining of left ankle and left shoulder pain. (*Id*. at 520.) Plaintiff reported surgery 20 years previously to reconstruct his ankle. (*Id*.) On examination, there was decreased range of motion of the left shoulder and a click; there were normal findings as to his buttocks, thigh, knee, calf/shin, ankle, foot and toes bilaterally and normal gait, normal motor strength, normal sensation, and intact deep tendon reflexes. (*Id*.) Dr. Mitromaras ordered left shoulder radiology. (*Id*. at 519.) On January 10, 2012, plaintiff saw Dr. Mitromaras, complaining of left shoulder pain. (*Id*. at 518.) On examination, there was a decreased range of motion and click of the left shoulder; his hands, upper arm, elbow, wrist, hand, and fingers were within normal limits; and he had a normal gait, normal motor strength, normal fine motor, and normal sensation. (*Id*.) X-rays of the left shoulder revealed mild degenerative changes; there was no fracture or dislocation. (*Id*. at 516; *see also id*. at 518.) Dr. Mitromaras prescribed Vicodin and Lisinopril. (*Id*. at 517.)

On February 6, 2012, plaintiff returned to Dr. Mitromaras to obtain refills for Vicodin (*Id*. at 514.) Plaintiff complained of severe pain in his left shoulder and left ankle, and stated that he had run out of Vicodin. (*Id*.) Physical examination again revealed a normal gait, normal motor strength, normal fine motor, normal sensation, and intact deep tendon reflexes. (*Id*.) Straight leg raise was negative. (*Id*.) His back, hips, lower extremities, feet, and ankles, bilaterally, were within normal limits, as were his hands and upper extremities, except for decreased range

of motion in his shoulder. (*Id*.) Dr. Mitromaras diagnosed rotator cuff syndrome, prescribing Vicodin. (*Id*. at 513.)

On February 27, 2012, plaintiff returned to Dr. Ilizarov for his left ankle pain, wearing a brace. (*Id*. at 494-95.) At the last visit, he had been sent to Dr. Sampson, who had recommended a brace prior to considering surgery. (*Id*. at 494.) Plaintiff was taking Vicodin and was still in great pain. (*Id*.) On examination, plaintiff had a limp on the left side, but his gait improved after a one-centimeter heel lift was used. (*Id*.) His sensation was intact, there was no erythema, and pulses were equal and physiologic. (*Id*.) There was tenderness over the subtalar joint. (*Id*.) Dr. Ilizarov's impression was left ankle pain and effusion, with pain most likely due to the arthritis of the subtalar joint. (*Id*.) Dr. Illizarov recommended that plaintiff wear higher heel sneakers and return to Dr. Sampson to discuss surgery. (*Id*. at 495.)

On March 19, 2012, plaintiff returned to Dr. Ilizarov for a follow-up. (*Id*. at 496-97.) He stated that he experienced a significant improvement in his gait after changing shoes to one with a higher heel. (*Id*. at 496.) Plaintiff complained, however, of left-shoulder pain of several months' duration. (*Id*.) On examination, Dr. Ilizarov found that plaintiff had positive impingement signs and reduced range of motion in the left shoulder and otherwise full range of motion in the other shoulder. (*Id*.) Motor strength was full, sensation was intact, reflexes were symmetrical, stability was intact, asymmetry was absent, Hawkins sign was negative, and Spurling sign was also negative. (*Id*.) Dr. Ilizarov diagnosed rotator cuff tendonitis, and recommended a magnetic imaging ("MRI") scan of the left shoulder followed, possibly, by physical therapy. (*Id*. at 497.)

On April 11, 2012, plaintiff returned to Dr. Ilizarov complaining of unchanged shoulder pain. (*Id*. at 498.) Dr. Ilizarov noted that the MRI revealed hypertrophic degenerative changes at the acromioclavicular joint, supraspinatus tendinosis with mild interstitial delamination, and degeneration of the glenohumeral joint; she recommended 6 weeks of physical therapy. (*Id*.)

During a May 24, 2012 follow-up, plaintiff stated that he had not gone for physical therapy because he did not know which place took his insurance. (*Id*. at 499.) Dr. Ilizarov emphasized the importance of following through with physical therapy. (*Id*.)

On July 30 and November 16, 2012, plaintiff returned to Dr. Mitromaras for a renewal of his medications Viagra, Lisinopril, and Flomax. (*Id*. at 504, 506.) Dr. Mitromaras noted that he was wearing his ankle brace. (*Id*. at 506). Examination on both occasions revealed normal upper extremities, as well as normal sensation, reflexes, gait, and motor strength. (*Id*. at 504, 506.)

5.  Testimony of Medical Expert

At the June 9, 2015 hearing, the ALJ declined to seek the testimony of Justin Willer, M.D., a neurologist, given that Dr. Willer had indicated prior to the hearing that there were no neurological issues and plaintiff's counsel expressly agreed that Dr. Willer's testimony was unnecessary. (*Id*. at 331.)

At the hearing, the ALJ did obtain the testimony of John Kwock, M.D., a board-certified orthopedic surgeon, who had reviewed the evidence in the record. (*Id*. at 332-44; *see id*. at 527-28.) Dr. Kwock opined that neither plaintiff's left shoulder rotator cuff impingement nor ankle fracture and

sequelae, singly or in combination, met or equaled a Listed Impairment. (*Id*. at 334-35.)

Dr. Kwock testified that, as to the rotator cuff impingement, x-rays revealed mild degenerative changes, and clinical findings showed restricted motion above shoulder height, but a functional range of motion; and there was no MRI in the record by which to assess the soft tissues, except a second-hand account of such an MRI. (*Id*. at 333-34.) Dr. Kwock opined that the shoulder impingement probably caused minimal to mild pain, noting the lack of surgical treatment. (*Id*. at 334.)

As to plaintiff's left ankle, Dr. Kwock opined that it dated from a poor outcome of a severe 1984 ankle fracture involving the tibia and soft tissue of the ankle that was later revised in a fusion. (*Id*. at 334.) Dr. Kwock opined that the fusion itself had not broken down, but rather that plaintiff's pain stemmed from arthritic changes, which would limit plaintiff's endurance ambulating and his ability to lift and carry. (*Id*. at 334-35.)

Dr. Kwock opined that, during the period from June 24, 2008 to March 6, 2013, plaintiff could: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours out of an 8-hour workday; sit for 7 hours out of an 8-hour workday; continuously handle, finger, and reach waist-to-chest; frequently push and pull with the upper extremities; frequently climb ramps/stairs, balance, stoop, kneel, and crouch; only occasionally push with the lower extremities; only occasionally work in high-exposed places, crawl, and reach above the shoulder; and never climb ladders or be near moving parts. (*Id*. at 335-37.)

Plaintiff's counsel challenged Dr. Kwock's opinion that plaintiff could walk 6 out of 8 hours, given that Dr. Kwock had also opined that plaintiff's ankle affected ambulating endurance. (*Id*. at 338-39.) Dr.

Kwock explained that he did not mean walking for an extensive period at any one time, but rather the kind of cumulative walking around an office during the course of the day entailed in light work. (*Id*.) Dr. Kwock further explained that plaintiff's ankle fusion and orthosis were good treatment for ankle arthritis and "came close to allowing plaintiff to run around pretty good." (*Id*. at 339.) Plaintiff's counsel also challenged Dr. Kwock's failure to account for the impact of the disparity between plaintiff's leg lengths, but Dr. Kwock explained that plaintiff's orthotics for his ankle fusion would remedy the discrepancy. (*Id*.) Dr. Kwock also explained that no cane would be needed for an ankle fusion with the rubber bottom orthotics, but that if plaintiff were more confident with one, a doctor "would not object . . . but it's not necessary." (*Id*. at 340.)

## B. Procedural History

### 1. *Carlsen I*

On April 7, 2010, plaintiff filed a claim for disability insurance benefits, alleging that he was disabled beginning on April 20, 2008. (*Id*. at 142-43.) On June 23, 2010, plaintiff's application was denied (*id*. at 83-85), and plaintiff requested a hearing on July 21, 2010 (*id*. at 45-46). Plaintiff testified at a hearing held before ALJ Seymour Rayner on April 28, 2011 (*id*. at 47-78), and by decision dated July 15, 2011, ALJ Rayner found that plaintiff was not disabled (*id*. at 22-30). The Appeals Council thereafter denied plaintiff's request for review on October 25, 2012. (*Id*. at 6-11.)

Plaintiff then commenced suit in this Court. *See Carlsen I*, 2014 WL 4536728. By Memorandum and Order dated September 11, 2014 (the "Memorandum and Order"), Judge Seybert remanded the case after concluding that the ALJ violated the treating

physician rule with respect to Dr. Carlson's medical opinion because, "[a]lthough it [was] clear that the ALJ did not give Dr. Carlson's opinions 'controlling weight,' the ALJ never actually specified what weight, if any, he ultimately gave to Dr. Carlson's opinions." *Id*. at *8. The Court instructed that, "[o]n remand, the ALJ should identify the degree of weight given to Dr. Carlson's opinions and explain why Dr. Carlson's opinions deserve such weight." *Id*. In addition, the Court "disagree[d] with Plaintiff that the ALJ failed to provide an analysis of Plaintiff's credibility," but directed that "the ALJ should readdress the issue of credibility on remand after properly applying the treating physician rule." *Id*. at *9.

With respect to the issue of plaintiff's obesity, the "Court agree[d] that remand on this ground [was] also required" because, although "'[o]besity is not in and of itself a disability . . . the Social Security Administration considers it to be a medically determinable impairment, the effects of which should be considered at the various steps of the [ALJ's] evaluation process . . . .'" *Id*. at *10 (quoting *Polynice v. Colvin*, No. 12-CV-1381, 2013 WL 6086650, at *6 (N.D.N.Y. Nov. 19, 2013)) (citing SSR 02-1p, 2000 WL 628049 (Sept. 12, 2002)). The Court found that "the record [did] show that Plaintiff was obese, and given that Plaintiff had a musculoskeletal impairment in the form of his left ankle injury, the ALJ should have considered the effects of Plaintiff's obesity, if any, in conjunction with Plaintiff's ankle impairment at the various steps of the evaluation process." *Id*. (footnote and citations omitted). Accordingly, the Court further instructed that, "on remand, the ALJ

should consider the combined impact of Plaintiff's left ankle impairment with his obesity throughout the evaluation process."[2] *Id*.

2. Post-Remand Proceedings

Following the Court's Memorandum and Order, the Appeals Council vacated the ALJ's ruling on February 12, 2015 and returned the case to the ALJ consistent with the Memorandum and Order. (AR at 383-84.) In that order, the Appeals Council noted that plaintiff had also filed a subsequent application for benefits that found him disabled since March 6, 2013, and instructed the ALJ to only consider if plaintiff was disabled prior to that date. (*Id*. at 383.)

On June 9, 2015, plaintiff appeared at a hearing in front of ALJ Patrick Kilgannon. (*Id*. at 338-53.) On July 31, 2015, the ALJ issued an unfavorable decision finding that plaintiff was not disabled between the amended alleged onset date of June 24, 2008 and March 6, 2013. (*Id*. at 305-26.) The Appeals Council denied plaintiff's request for review on April 26, 2016 (*id*. at 296-301), making the ALJ's July 31, 2015 decision the final decision of the Commissioner.

Plaintiff filed the instant action seeking reversal of the ALJ's decision on June 27, 2016. (ECF No. 1.) The Court received the Administrative Record on September 26, 2016. (ECF No. 10.) Plaintiff filed a motion for judgment on the pleadings on November 23, 2016. (ECF No. 11.) The Commissioner opposed plaintiff's motion and cross-moved for judgment on the pleadings on May 12, 2017.[3] (ECF No. 18.)

---

[2] Because the Court found that remand was warranted based on the ALJ's violation of the treating physician rule, it did "not address Plaintiff's additional argument that the evidence submitted to the Appeals Council after the ALJ's decision warrant[ed] remand.

However, since this evidence [was] now part of the record," the Court ordered the ALJ to "consider such evidence on remand." *Id*. at *8 (citation omitted).

[3] By letter dated April 24, 2017 (ECF No. 17), the

The Court has fully considered all of the parties' submissions, as well as the Administrative Record.

## II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Further, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation omitted); see also *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## III. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B)).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not

---

Commissioner informed the Court that she had served her cross-motion on plaintiff. However, the

Commissioner did not file her submissions with the Court until May 12, 2017.

have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's July 31, 2015 Ruling

Here, the ALJ determined that plaintiff did not engage in substantial gainful employment between his amended alleged onset date of June 24, 2008 and March 6, 2013—the date his subsequent application for disability benefits was granted. (AR at 311.) The ALJ found plaintiff to have the following "severe impairments" during the relevant period: joint disorders of the left shoulder, bilateral knees, and left ankle, as well as obesity. (*Id.*) The ALJ found that these impairments did not, however, fall under the list of impairments outlined in Appendix 1 of the regulations. (*Id.* at 312.)

At the fourth step, the ALJ concluded that plaintiff had the RFC to perform light work, except that plaintiff was

> restricted to the following specific parameters of limitation: lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking six hours out of an eight-hour day and sitting seven hours out of an eight hour day with normal breaks; with frequently [sic] ability in pushing and pulling with the upper extremities, climbing ramps/stairs, balancing, stooping, kneeling, and crouching; occasional ability in pushing and pulling with the lower extremities, crawling, and overhead reaching left upper extremity; preclusion from climbing ladders/ropes/scaffolds and avoiding exposure to unprotected heights and moving machinery.

(*Id.* at 312-13.)

The ALJ afforded the findings of Drs. Kwock, Manyam, and Acer great weight in his analysis, while giving "little weight" to Dr. Carlson's opinion and "some weight" to the findings of Dr. Sultan. (*Id.* at 314-16.) The ALJ afforded great weight to Dr. Kwock on the grounds that he was "an orthopedic surgeon and impartial medical expert." (*Id.* at 314.) The ALJ added that Dr. Kwock's findings were granted great weight because of "his review of the entire record . . . his familiarity with . . . [the] disability program . . . his availability for cross-examination . . . [and that his] opinion [was] consistent with, and well supported by, the evidence of record." (*Id.*) The ALJ also afforded "great weight" to the findings of Drs. Manyam and Acer. (*Id.* at 315.) He found that both sets of findings were "derived following a thorough physical and mental status examination[] of [plaintiff] and their findings [were] set forth

in a [sic] detailed narrative reports which are consistent with other opinions in the record and the record as a whole." (*Id.*)

The ALJ afforded "little weight," however, to treating physician Dr. Carlson, despite his "longitudinal history with" plaintiff, on the grounds that Dr. Carlson's findings were "not consistent with the record as a whole and offer[ed] limitations which [were] not supported by any clinical findings or clinical diagnostic testing in the record." (*Id.*) Moreover, the ALJ added that Dr. Carlson was a "practitioner of family medicine" and was not a "specialist in orthopedics, physiatry, or other musculoskeletal discipline." (*Id.*) In addition, the ALJ afforded Dr. Sultan's opinion "some weight" because Dr. Sultan "saw [plaintiff] only one time, in 2011, and [had] no personal knowledge as to [plaintiff's] medical history beyond that one examination." (*Id.* at 316.) The ALJ also found Dr. Sultan's opinion "unpersuasive in that [plaintiff] was able to work for many years in his usual occupation despite being afflicted with the limitations Dr. Sultan offer[ed]." (*Id.*)

As a result, the ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that plaintiff's "statements concerning the severity, intensity, persistence and limiting effects of these symptoms" were not credible to establish disability for the relevant period. (*Id.* at 317.) In addition, the ALJ found that "[a]lthough the claimant references more significant limitations, none of this [spoke] to a true lack of independence." (*Id.* at 318.)

Having concluded that plaintiff had the RFC to perform light work within certain limitations, the ALJ found that plaintiff could not perform his past relevant work as a tractor trailer driver, but that plaintiff could use his transferrable skills as, *inter alia*, a loading inspector, perishable freight inspector, or shipping clerk, of which there were a significant number of jobs in the national economy. (*Id.* at 318-20.) Consequently the ALJ determined that plaintiff did not qualify for disability benefits. (*Id.* at 321.)

C. Analysis

Plaintiff challenges the ALJ's decision on the following grounds: (1) that the ALJ failed to follow the treating physician rule; (2) that the ALJ improperly evaluated plaintiff's credibility; and (3) that the ALJ did not properly address plaintiff's obesity consistent with the Memorandum and Order. As set forth below, the Court concludes that the ALJ failed to properly apply the treating physician rule and to take plaintiff's obesity into account throughout his analysis. Thus, remand is warranted, and the Court need not, and does not, address plaintiff's credibility argument.

Plaintiff also asks the Court to (1) remand this matter solely for a benefits calculation, or in the alternative, (2) remand this matter to a new ALJ for an expedited hearing. However, for the reasons set forth below, the Court concludes that such remedies are inappropriate at this juncture.

1. Opinion of the Treating Physician

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118.

The rule as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When an ALJ decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see also Perez v.*

*Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (internal citation omitted)).

Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Those factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [ALJ's] attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). If an ALJ fails "to provide 'good reasons' for not crediting the opinion of a claimant's treating physician," remand is appropriate. *Snell*, 177 F.3d at 133.

Here, remand is appropriate because the ALJ failed to give "good reasons" for according less than controlling weight to the opinion of plaintiff's treating physician, Dr.

Carlson.[4] *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not *comprehensively* set forth reasons for the weight assigned to a treating physician's opinion." (emphasis added)). The ALJ afforded Dr. Carlson's opinion "little weight" on the grounds that his opinion was "not consistent with the record as a whole and offer[ed] limitations which are not supported by any clinical findings or clinical diagnostic testing in the record." (AR. at 315.) He also stated that Dr. Carlson is "a practitioner of family medicine and not a specialist in orthopedics, physiatry, or other musculoskeletal disciple." (*Id*.) The ALJ further noted that plaintiff had a "longitudinal treatment history" with Dr. Carlson, but he added nothing further to explain why plaintiff's treating physician was not granted controlling weight. (*Id*.)

Moreover, the ALJ failed to explicitly consider several factors such as the frequency of Dr. Carlson's examinations of plaintiff; the length, nature, and extent of the treatment relationship between plaintiff and Dr. Carlson (which began in 2010); and the evidence in support of Dr. Carlson's opinion. *Id*. at 315; *see also* 20 C.F.R. § 404.1527(c); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 265-68 (E.D.N.Y. 2010) (finding that remand was appropriate where the ALJ did not explicitly consider several factors when rejecting treating physician's opinion). As described above, Dr. Carlson completed a Multiple Impairment Questionnaire in March 2011. (AR at 265-72.) Therein, Dr. Carlson noted that he had been treating plaintiff since February 2010, every 2-3 months. (*Id*. at

265.) Dr. Carlson opined that plaintiff: could sit and stand/walk for no more than one hour each in an 8-hour workday (*id*. at 267); could not sit or stand continuously in a work setting, and would need to get up and move around every half hour (*id*. at 267-68); and could lift and carry up to 10 pounds on an occasional basis (*id*. at 268). Dr. Carlson also opined that plaintiff: had arthritis in both hands and, therefore, would have moderate limitations in grasping, turning, twisting, fine manipulations, fingering, handling, and reaching (*id*. at 268-69); was completely unable to push, pull, kneel, bend, or stoop; and had to avoid wetness, noise, fumes, gases, temperature extremes, humidity, dust, and heights (*id*. at 271). He added that plaintiff also had limited vision. (*Id*.) Dr. Carlson further stated that plaintiff's pain, fatigue, and other symptoms would interfere with his attention and concentration on a constant basis. (*Id*. at 270.) Dr. Carlson also said that plaintiff's impairment would interfere with his ability to keep the neck in a constant position. (*Id*. at 269.) He stated that plaintiff's symptoms and limitations had existed since March or April of 1984. (*Id*. at 271.)

The ALJ discounted Dr. Carlson's opinion in part because it was "not consistent with the record as a whole and offer[ed] limitations which [were] not supported by any clinical findings or clinical diagnostic testing in the record." (*Id*. at 315.) However, Dr. Carlson explicitly stated that his views were based on clinical examination findings of hardware located in plaintiffs' left ankle and x-rays. (*Id*. 265-66.) Further, when Dr. Fracchia examined plaintiff in July 2008, x-rays of the left ankle revealed four intact screws from plaintiff's prior surgeries, and Dr. Fracchia diagnosed left ankle

---

[4] As plaintiff's treating physician, Dr. Carlson was the "medical professional[ ] most able to provide a detailed, longitudinal picture of [plaintiff's] medical

impairment(s) and [brought] a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2).

osteoarthritis, status post fusion. (*Id.* at 185.) The range of motion in plaintiff's ankle was also limited, and it was tender to palpation. (*Id.* at 184-85.) There was decreased sensation on the top of his foot and the front of his ankle, which plaintiff stated was unchanged from years earlier. (*Id.* at 185.) Nevertheless, the ALJ afforded "great weight" to the medical opinions of Dr. Manyam, a consultative examiner who examined plaintiff once in July 2010 (*id.* at 231-34), and Dr. Kwock, a non-examining medical expert who never treated plaintiff (*id.* at 332).

However, the Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." *Id.* The Court held that, in doing so, the ALJ failed "to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight . . . because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."); *Santiago*, 441 F. Supp. 2d at 628 (holding that ALJ erred in giving consulting physicians' opinions controlling weight over those of the treating physicians).

Likewise, the Second Circuit has said that a "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis." *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987); *see also Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) ("The general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'" (quoting *Allison v. Heckler*, 711 F.2d 145, 147-48 (10th Cir. 1983))); *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight."). Thus, Dr. Kwock's opinion "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician" because Dr. Kwock was a "nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995); *see also Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("[R]eliance on the opinion of nonexamining physicians cannot, by itself, constitute substantial evidence." (citing *Lester*, 81 F.3d at 831)); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). Accordingly, the ALJ's "heavy reliance on [Dr. Kwock's] testimony also contravened the clear guidance of SSA regulations, as [Dr. Kwock] was a nonexamining source whose opinions are to be accorded less weight than those of examining sources and especially treating sources." *Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 ENV MDG, 2011 WL 1004696, at *4 (E.D.N.Y. Mar. 18, 2011) (citing 20 C.F.R. § 404.1527).

In short, the ALJ failed to provide "good reasons" for rejecting the treating physician's opinions. *Snell*, 177 F.3d at 133. That failure

"by itself warrants remand." *Selian*, 708 F.3d at 419. In addition, remand is further warranted based on the ALJ's heavy reliance on the opinions of consulting and non-examining physicians.[5] *See id.*; *Brown*, 2011 WL 1004696, at *4.

### 2. Plaintiff's Obesity

Plaintiff also contends that the ALJ "failed to indicate if he considered the impact of Mr. Carlsen's obesity on his residual functional capacity or the impact it had on the claimant's ankle impairment." (Pl.'s Br., ECF No. 12, at 18.) In *Carlsen I*, the Court explicitly directed that "on remand, the ALJ should consider the combined impact of Plaintiff's left ankle impairment with his obesity *throughout* the evaluation process." 2014 WL 4536728, at *10 (emphasis added). The ALJ did not follow that instruction. Instead, after initially citing the Court's direction that "plaintiff's obesity be considered pursuant to SSR 02-1p" (AR at 308-09), at step two of the analysis, the ALJ listed obesity as one of plaintiff's severe impairments (*id.* at 311); and at step three, he determined that obesity was not a *per se* impairment (*id.* at 312).

However, there the discussion ends. There is no indication that the ALJ considered plaintiff's obesity at step four in determining plaintiff's RFC, notwithstanding the Court's prior caution that, "given that Plaintiff had a musculoskeletal impairment in the form of his left ankle injury, the ALJ should have considered the effects of Plaintiff's obesity, if any, in conjunction with

Plaintiff's ankle impairment at the various steps of the evaluation process." *Carlsen I*, 2014 WL 4536728, at *10.

Accordingly, on remand, the ALJ must also definitively address the impact, if any, plaintiff's obesity had on his RFC at step four of the disability evaluation procedure.

## IV. REMEDY

As relief, plaintiff requests that the Court (1) remand solely for a benefits calculation, or, in the alternative, (2) remand the case to a new ALJ for an expedited hearing. For the reasons set forth below, the Court concludes that none of these remedies is warranted at this juncture.

### A. Remand for Benefits Calculation

Plaintiff contends that the "reliable evidence points in only one direction"—that plaintiff is disabled—and, therefore, that the case should be remanded simply for a calculation of benefits. (Pl.'s Br. at 20.) However, the Second Circuit has emphasized that "reversal for calculation of benefits is appropriate only when there is 'no apparent basis to conclude that a more complete record might support the Commissioner's decision . . . .'" *De Mota v. Berryhill*, No. 15 CIV. 6855 (PED), 2017 WL 1134771, at *9 (S.D.N.Y. Mar. 24, 2017) (quoting *Rosa*, 168 F.3d at 83) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (remand for calculation of benefits only appropriate where record contains "persuasive proof of disability" and remand for further evidentiary

---

[5] Plaintiff also contends that the ALJ failed to properly evaluate plaintiff's credibility. Because the Court concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the Court need not decide at this time whether the ALJ erred in assessing plaintiff's credibility. The Court recognizes that "[i]t is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses,

including the claimant." *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations and alteration omitted). However, to the extent that the ALJ, on remand, re-evaluates the evidence in addressing the treating physician rule, in accordance with this Memorandum and Order, the ALJ should also consider whether that re-evaluation alters his assessment of plaintiff's credibility in light of the evidence as a whole.

proceedings would serve no purpose)); *see also Surrusco v. Berryhill*, No. 16-CV-4649 (JFB), 2017 WL 3017197, at *2 (E.D.N.Y. July 17, 2017).

Here, the Court disagrees with plaintiff that remand for a benefits calculation is proper at this juncture because such a remedy "is appropriate only in the rare circumstance where there is persuasive proof of disability in the record and remand for further evidentiary development would not serve any purpose." *Arshad v. Astrue*, No. 07 CIV 6336 (JSR) (KNF), 2009 WL 996055, at *3 (S.D.N.Y. Apr. 6, 2009); *see also Rosa*, 168 F.3d at 83; *Parker*, 626 F.2d at 235. As set forth above, the ALJ violated the treating physician rule and failed to adequately consider plaintiff's obesity, but the Court is "unable to say that on remand, and with a proper analysis" that "a finding of disability prior to [March 6, 2013] would necessarily result." *Baggett v. Astrue*, No. 5:11-CV-0195 NAM/DEP, 2012 WL 2814369, at *14 (N.D.N.Y. June 13, 2012), *report and recommendation adopted*, No. 5:11-CV-0195, 2012 WL 2814329 (N.D.N.Y. July 10, 2012); *see also Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996) ("[A] decision to reverse and direct an award for benefits should be made only when . . . substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."). The Administrative Record includes several medical reports that plaintiff's physical condition was normal or unremarkable during the period at issue. (*See, e.g.*, AR at 275, 496.) For instance, Dr. Mitromaras opined that plaintiff's 2012 examination results indicated "normal upper extremities, as well as normal sensation, reflexes, gait, and motor strength." (*Id.* at 506.) As a result, the Court cannot say, based on the current record, that substantial evidence indicates that plaintiff was disabled prior to March 6, 2013.

## B. Appointment of a New ALJ

Alternatively, plaintiff asks that the Court direct the Commissioner to assign a new ALJ to this matter on remand because "the ALJ's decision exhibits an unwillingness to either properly apply the Commissioner's Regulations or to follow the Court's [Memorandum and] Order to properly adjudicate the claim." (Pl.'s Br. at 20.)

The decision to assign a case to a new ALJ on remand is usually left to the discretion of the Commissioner, and courts will generally not get involved without good reason. *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 222 (E.D.N.Y. 1998) (citing *Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir. 1993)). Indeed, after *Carlsen I*, a different ALJ presided over plaintiff's June 2015 hearing and issued the ruling *sub judice*.

Based upon case authority from the Second Circuit (and sister circuits), this Court has held that reassignment is permissible relief only under circumstances where the ALJ's fundamental impartiality is compromised by his or her previous actions in a case. *See Miles v. Chater*, 84 F.3d 1397, 1401 (2d Cir. 1996). The relevant factors for determining whether a new ALJ should be assigned on remand include:

> (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party.

*Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004).

The Court disagrees with plaintiff that reassignment is warranted in this case. Upon remand, the ALJ did, as the Court instructed, accord weight to the treating physician's opinion, but failed to explain why that opinion was not entitled to "controlling weight." The ALJ is instructed to provide such an explanation following remand by this Court. Similarly, although the ALJ did not consider plaintiff's obesity at step four, he did consider it at earlier steps. Plaintiff does not argue, nor is there any relevant evidence in the record, that the ALJ "manifested bias or inappropriate hostility" toward plaintiff. Accordingly, the Court leaves it to the Commissioner to decide whether reassignment is appropriate in this case following remand.

## C. Remand for an Expedited Hearing

Finally, plaintiff claims that an "expedited hearing and decision" is needed on remand to the ALJ. (Pl.'s Br. at 20.) The Second Circuit has stated, in a decision cited by plaintiff, that "in cases involving an ALJ's failure to call a vocational expert, district courts that select remand as a remedy should consider imposing a time limit on the subsequent proceedings. In this case, the past delay is of such magnitude—years—that a time limit is imperative." *Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004). Likewise, other district courts have imposed time limits where remand occurred several years after filing of the benefits application and the ALJ failed to develop the record. *See, e.g.*, *Barbour v. Astrue*, 950 F. Supp. 2d 480, 491 (E.D.N.Y. 2013) ("District courts in this circuit have been instructed to consider imposing a time limit on subsequent proceedings when ordering a remand for further development of the record. As it has been more than seven years since the Plaintiff filed his initial application for benefits, a time limit is appropriate in this case to prevent undue delay." (citation omitted)); *Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 588 (S.D.N.Y. 2008) (same).

Here, plaintiff does not assert that the ALJ erred in developing the Administrative Record, but rather, that the ALJ mistakenly applied the law to the facts. (Pl.'s Br. at 10-19.) Moreover, plaintiff has not argued that additional fact-finding is required upon remand. In addition, unlike *Butts*, there is no evidence of years-long delay; on the contrary, the ALJ held a hearing and issued a ruling approximately nine months after *Carlsen I*. *See supra* Part I.B.2.

Accordingly, although the Court recognizes that this case has a lengthy procedural history and has already been remanded once, the Court declines, in its discretion, to remand with a time limit requiring the ALJ to issue a new decision by a date certain.

## V. Conclusion

For the reasons set forth above, the Court denies plaintiff's motion for judgment on the pleadings and the Commissioner's cross-motion for judgment on the pleadings. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date:   September 19, 2017
        Central Islip, NY

* * *

Plaintiff is represented by Charles E. Binder of the Law Offices of Harry J. Binder and Charles E. Binder, P.C., 60 East 42nd Street, Suite 520, New York, New York 10165.

The Commissioner is represented by Assistant United States Attorney Layaliza K. Soloveichik of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York 11201.